UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MACK R. TEDDER,

                    Plaintiff,

v.
                                                    Case No. 3:19-cv-742-MMH-LLL

MARK S. INCH, et al.,

                    Defendants.

_____

## ORDER

### I. Status

Plaintiff Mack R. Tedder, an inmate of the Florida penal system, initiated this action on June 20, 2019, by filing a pro se Complaint (Doc. 1-4). He filed an Amended Complaint (Doc. 27) on February 3, 2020, and a Second Amended Complaint (SAC; Doc. 38) with exhibits (Docs. 38-1; 38-2) on June 2, 2020.[1] In the SAC, Tedder asserts claims pursuant to 42 U.S.C. § 1983 against the following Defendants: (1) Prison Rehabilitative Industries and Diversified Enterprises (PRIDE); (2) Mark S. Inch, Secretary of the Florida Department of Corrections (FDOC); (3) Remero C. Green, Mission Programs Director at

---

[1] For all documents filed in this case, the Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

PRIDE; and (4) Brenda Griffis, a PRIDE employee in the dental laboratory at Union Correctional Institution (UCI). He asserts that Defendants engaged in unlawful hiring practices and discriminated against him when they failed to hire him to work in the UCI dental laboratory. As relief, he seeks monetary damages as well as declaratory and injunctive relief.

This matter is before the Court on Defendants PRIDE, Green, and Griffis's Motion for Summary Judgment (Motion; Doc. 66). They submitted exhibits in support of the Motion. See Docs. 66-1 through 66-3; 72-1. The Court advised Tedder of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. See Order (Doc. 6); Summary Judgment Notice (Doc. 67). Tedder filed a response in opposition to the Motion. See Motion in Opposition to Defendants' Rule 56(a) Motion (Response; Doc. 68). As such, Defendants' Motion is ripe for review.

## II. Plaintiff's Allegations[2]

In the SAC, Tedder describes himself as a sixty-eight-year-old disabled,[3] close-custody, parole-eligible, white male inmate who is serving a term of life imprisonment with a 2024 presumptive parole release date (PPRD), as of 2018. See SAC at 13-14, 17-18, 21-22. He states that he has been incarcerated since 1974, and the FDOC houses him at UCI. See id. at 14. Tedder alleges Defendants Green and Griffis unjustly denied him a job in the dental laboratory, and that other similarly-situated (close-custody, life-sentenced) inmates were treated more favorably than he was during the PRIDE hiring process. See id. at 17-18, 20.

As to the underlying facts of his Fourteenth Amendment equal protection claims, Tedder asserts that he has submitted twelve job applications to the PRIDE dental laboratory over the course of approximately four years, beginning on February 10, 2014.[4] See id. at 14-16. According to Tedder, the

---

[2] The Court previously granted in part and denied in part Defendants' motions to dismiss (Docs. 39, 40). See Order (Doc. 55). As such, the claims remaining in this aciton are Tedder's: (1) Fourteenth Amendment equal protection claims against Defendants PRIDE, Green, and Griffis, and (2) requests for prospective declaratory and injunctive relief against Defendant Inch in his official capacity. See id. at 49 n.22. Because this matter is before the Court on a summary judgment motion filed by Defendants PRIDE, Green, and Griffis, the Court's recitation of the facts will focus on Tedder's allegations as to them.

[3] According to Tedder, he lost one half of his left middle finger in a prison-related accident in 1979. See SAC at 17, 21-22.

[4] Tedder states that he submitted job applications on February 10, 2014; August 18, 2014; March 30, 2015; July 8, 2015; October 30, 2015; February 24, 2016;

3

laboratory hired life-sentenced inmates during those years, and Defendant Griffis discriminated against him when she failed and/or refused to interview him. See id. Tedder states that he submitted his thirteenth job application to the PRIDE dental laboratory on February 1, 2018, and the hiring staff granted him an interview on February 22, 2018. See id. at 16. He avers that P. Pellet (the plant supervisor and hiring manager) interviewed him and gave him a skills test, which included carving a wax candle into particular shapes within a one-hour time frame. See id. at 16-17. According to Tedder, he successfully completed the test and performed "so well" that Pellet wanted to hire him "on the spot." Id. at 17 (emphasis deleted). Instead, Pellet referred Tedder to Griffis, who commented on Tedder's tugboat experience and asked Tedder "some questions," including if his 2024 PPRD was "a possibility or a maybe." Id. Tedder asserts that he reaffirmed it was his PPRD. See id. He avers that Griffis explained:

> I have some bad news for you.… [Y]ou are what we need in the Dental Lab, and you have done about the best that I have ever seen on the test, but you have a life sentence[,] and we have all the life sentence[d] inmates we can have.

---

May 9, 2016; October 4, 2016; May 5, 2017; July 21, 2017; October 16, 2017; and December 15, 2017, but was never granted an interview until he submitted his thirteenth job application in February 2018. See SAC at 14-16.

Id. (emphasis deleted). Tedder states that Griffis informed him about a 60/40 quota that the hiring staff "must abide by," and she advised him to immediately contact her if the sentencing court reduced his sentence. Id. He maintains that PRIDE's 2018-2020 hiring of life-sentenced inmates William Davis #888492, Steven Weldon #573245, and Arthur Wilson #863153 "negates" Defendants' "60/40 quota" explanation for not hiring him. Id. at 20. Tedder asserts that Griffis discriminated against him because of his status as a close-custody, life-sentenced inmate with a 2024 PPRD. See id. at 18.

Tedder states that he wrote a letter to PRIDE four days later (February 26, 2018), stating in pertinent part:

> I am writing concerning the unlawful hiring practices and discrimination of the Union dental lab against me.
>
> Beginning on February 10, 2014 to the present date, I had some twelve previous job applications [sent] to Union dental lab for employment opportunities and they all went unanswered until I sent in the latest job application to Union dental lab on February 1, 2018.
>
> On February 22, 2018, I received from Union dental lab, the very first job interview in the four (4) year period of which I sought employment opportunity from the dental lab.
>
> In years past, I was overlooked by Union dental lab, for other life term inmates who had not sought out employment opportunities until several years after I first began to seek employment with Union dental lab.

5

And, this can be easily verified from a review of Union dental lab hiring records.

**After the interview on February 22, 2018, I was told that I would not be hired because of a 60/40 hiring practice**.

When I got back to work where I work in the law library, I began to research the denial of being hired on February 22, 2018, and I discovered many things.

Pursuant to Florida Statute, Section 760.10: "It is an unlawful employment practice for an employer: (a) … to fail or refuse to hire any individual, or otherwise discriminate against any individual with respect to … privileges of employment …" (b) "[t]o limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual o[f] employment opportunities…[.]"

Pursuant to Florida Statute, Section 946.502(6): "It is further the intent of the Legislature that the corporation will devise and operate correctional work programs to utilize inmates of all custody levels <u>with specific emphasis on reducing idleness among close custody inmates</u>."

Pursuant to Florida Statute, Section 946.520: … "This 60-percent requirement does not apply to any correctional work program, or private sector business authorized under this part, within an institution for any year in which, as of January 1 of that year, the average years remaining before the tentative release date of all inmates assigned to that institution exceeds 12 years."

Pursuant to Florida Statute, Section 946.523: (1)…"The purposes and objectives of this program are to: (d) [p]rovide additional opportunities for

> rehabilitating inmates who are otherwise ineligible to work outside the prisons, <u>such as maximum security inmates</u>."
>
> Therefore, as a result of the above authorities and the actions performed against me, I sincerely request that I will be hired by PRIDE Union dental lab in the very near future in order to end this discrimination being directed toward me for whatever reason.

Doc. 38-1 at 3-4 (emphasis added and deleted). Tedder asserts that Defendant Green "failed to correct the injury," SAC at 21, on March 8, 2018, when he stated:

> PRIDE is in receipt of your letter postmarked March 01, 2018, regarding employment opportunity.
>
> Hiring is based on the needs of the industry. Inmates interested in PRIDE assignment must receive the approval of the institution's classification department. PRIDE['s] new inmate profile is to hire inmates with 6-10 years left on their sentence, as they will be a candidate for our transition program.

Doc. 38-2 at 1. Tedder maintains that the referenced "new inmate profile" did not consider life-sentenced inmates, such as Tedder, with six to ten years to reach their PPRDs. SAC at 20. He states that the PRIDE hiring practice discriminated against him and "all other similarly situated inmates" housed at UCI. <u>Id.</u> at 20-21.

### III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[5] An

---

[5] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

9

In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Guevara v. NCL (Bahamas) Ltd., 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Summary of the Arguments

Defendants PRIDE, Green, and Griffis maintain that the Court should grant summary judgment in their favor as to Tedder's Fourteenth Amendment equal protection claims against them. See generally Motion. They also assert that they are entitled to qualified immunity. Id. at 11-12. In his Response, Tedder contends that there are genuine issues of material fact that preclude summary judgment, and asks that the Court set this case for trial. See Response at 1, 8.

## V. Applicable Law

The Equal Protection Clause of the Fourteenth Amendment provides that no State may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It requires that States

10

treat all similarly situated persons alike. <u>City of Cleburne, Tex. v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985). Generally, to establish a claim cognizable under the Equal Protection Clause, a prisoner must demonstrate that "(1) he is similarly situated to other prisoners who received more favorable treatment[,] and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." <u>Sweet v. Sec'y, Dep't of Corr.</u>, 467 F.3d 1311, 1318-19 (11th Cir. 2006) (citing <u>Jones v. Ray</u>, 279 F.3d 944, 946-47 (11th Cir. 2001); <u>Damiano v. Fla. Parole and Prob. Comm'n</u>, 785 F.2d 929, 932-33 (11th Cir. 1986)). However, the United States Supreme Court also has recognized "class of one" equal protection claims. <u>Vill. of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (per curiam). A "class of one" equal protection claim does not allege discrimination against a protected class, but instead asserts that the plaintiff "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." <u>Young Apartments, Inc. v. Town of Jupiter, Fla.</u>, 529 F.3d 1027, 1032 n.1 (11th Cir. 2008) (quoting <u>Griffin Indus. v. Irvin</u>, 496 F.3d 1189, 1202 (11th Cir. 2007)). Notably, "establishing a 'class of one' equal protection claim can be an onerous task, and properly setting forth a 'class of one' claim should not be regarded as

a perfunctory matter." <u>Leib v. Hillsborough Cnty. Pub. Transp. Comm'n</u>, 558 F.3d 1301, 1307 (11th Cir. 2009).

To establish a "class of one" claim, a plaintiff must show that (1) the defendant intentionally treated him differently from other similarly situated individuals, and (2) there was no rational basis for the different treatment. <u>Griffin Indus.</u>, 496 F.3d at 1202-07; <u>Bumpus v. Watts</u>, 448 F. App'x 3, 5 (11th Cir. 2011). The Eleventh Circuit Court of Appeals has explained that "[b]ecause '[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause,' the plaintiff must show that those 'others similarly situated' are 'prima facie identical in all relevant respects.'" <u>Burns v. Town of Palm Beach</u>, 999 F.3d 1317, 1352 (11th Cir. 2021) (quoting <u>Olech</u>, 528 U.S. at 564; <u>Campbell v. Rainbow City</u>, 434 F.3d 1306, 1314 (11th Cir. 2006)); <u>see</u> <u>Young</u>, 529 F.3d at 1045-46 (noting that a plaintiff must satisfy the similarly situated standard whether asserting an equal protection claim under a class of one theory or a traditional theory of discrimination based on a suspect classification).

## VI. Discussion and Analysis

### A. Tedder's Fourteenth Amendment Equal Protection Claims against Defendants PRIDE, Green, and Griffis

Tedder asserts that Defendants discriminated against him when Griffis failed to hire Tedder for a job in the dental laboratory because of his life

sentence and when Green failed to remedy the injustice while other similarly situated inmates were treated more favorably than Tedder. He also states that Defendants failed to consider, at the February 22, 2018 interview, that he had less than ten years remaining before he reached his 2024 PPRD. In response, Defendants contend that they "lacked the requisite authority to assign" Tedder to work in the dental laboratory. Motion at 9 (citing Gambetta v. Prison Rehab. Indus. & Diversified Enters., Inc., 112 F.3d 1119, 1122 (11th Cir. 1997) (discussing Florida's creation of PRIDE); Fla. Stat. § 946.520). Additionally, they argue that Tedder has failed to demonstrate that they "engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." Id. They maintain that Tedder's status as a close-custody, life-sentenced inmate with an impending PPRD "does not … qualify as a protected class." Id. (citing SAC at 19-20). Additionally, they state that "[t]he lack of any record evidence suggesting Defendants and Ms. Griffis and Mr. Green, in particular, engaged in intentional discrimination is fatal to [Tedder]'s claim." Id. at 10. Defendants argue that the "record evidence . . . clearly shows there are a number of factors considered in evaluating an inmate's participation in PRIDE's work programs." Id. at 9 (citing Doc. 72-1 at 106-08). In support of their position, Defendants submitted exhibits, including the Deposition of Mack Tedder (P.

13

Depo.), Def. Ex. A, Doc. 66-1; Defendant Griffis' Answers to Plaintiff's First Set of Interrogatories, Def. Ex. B, Doc. 66-2; Defendant Green's Answers to Plaintiff's First Set of Interrogatories, Def. Ex. C, Doc. 66-3; and PRIDE's Responses to Plaintiff's Request for Production, Def. Ex. D, Doc. 72-1.

In her answers to Tedder's interrogatories, Griffis states in pertinent part:

> Defendant submits that any inquiries she made to Plaintiff were [a] good faith effort and part of PRIDE's preliminary assessment of Plaintiff for the work program; all for consideration by the FDOC in rendering a decision on Plaintiff's placement in the dental lab work program.
>
>     . . . .
>
> Defendant has not ever cited a 60/40 rule to any inmates, including Plaintiff. Defendant also was not aware of Plaintiff's presumptive parole release date. More specifically, Defendant did not, and could not, make any final determination as to Plaintiff's assignment in the dental lab work program operated by PRIDE. At all times material hereto, Defendant has understood Plaintiff is currently serving a life sentence. Defendant submits that inmates with six (6) to ten (10) years left on their sentence[s] have been assigned to PRIDE's dental lab work program.
>
>     . . . .
>
> In particular, Defendant denies that she ever knowingly and willingly discriminated against Plaintiff. At all times material hereto, Defendant maintains that her representations to Plaintiff were accurate, reasonable, in good faith, and in accordance

14

> with the scope and performance of her duties with
> PRIDE.
>
> . . . .
>
> Defendant denies ever acting with a callous disregard,
> distain, or discriminatory purpose towards Plaintiff.

Doc. 66-2 at 5-8. Additionally, in his answers to Tedder's interrogatories,

Defendant Green states in pertinent part:

> Defendant does not make any hiring decisions in his
> capacity with PRIDE. Defendant also denies Plaintiff's
> inquiry and specifically denies that he ever knowingly
> and willingly discriminated against Plaintiff. At all
> times material hereto, Defendant maintains that his
> conduct and representations to Plaintiff were
> accurate, reasonable, in good faith, and in accordance
> with the scope and performance of his duties with
> PRIDE.

Doc. 66-3 at 6-7.

To withstand entry of summary judgment, Tedder is required to present

evidence to show that there is a genuine issue for trial. In opposing Defendants'

Motion, Tedder reasserts the factual allegations he made in his SAC and

includes additional facts related to the PRIDE hiring process.[6] Additionally,

---

[6] Tedder also submitted the affidavits of Roderick Childers #073313 and Glenn
A. Larsen #649233. See Childers Affidavit, Doc. 68 at 19-20; Larsen Affidavit, Doc.
68 at 21-24. In his Response, Tedder describes the affidavits as sworn and notarized,
see Response at 15, however, they are not, see Childers Affidavit at 19-20; Larsen
Affidavit at 23-24. Indeed, not only are they not sworn or notarized, but they are not
even signed. Thus, the Court declines to consider them. Additionally, Childers asserts
that the hiring staff interviewed him on February 22, 2018 (the same day they
interviewed Tedder) and told him he would not be hired because he had failed the

Tedder submitted (1) the first page of a two-page PRIDE application form, <u>see</u> Doc. 68 at 17; (2) a list of the wages he believes he would have earned if PRIDE had hired him on February 22, 2018, <u>see</u> <u>id.</u> 18; and (3) a document, titled Reasonable Attorney Costs & Fees, that lists the costs Tedder allegedly incurred while pursuing his claims in this lawsuit, <u>see</u> Doc. 68 at 25. He also submitted his own affidavit, addressing an incident unrelated to the PRIDE hiring process. <u>See</u> Tedder Affidavit, Doc. 70. His affidavit pertains to Defendants' counsel's alleged June 2022 request for access to Tedder's records, which Tedder opposes. <u>See</u> <u>id.</u>

Notably, Florida Statutes section 946.520, titled "Assignment of inmates by Department of Corrections," requires that the FDOC "shall exert its best efforts to assign inmates" to correctional work programs. Fla. Stat. § 946.520(1). As such, the FDOC decides which inmates may participate in correctional work programs operated by PRIDE, and retains ultimate control over the assignment of inmates. <u>See</u> Docs. 66-2 at 5; 66-3. At his deposition,

carving skills test. <u>See</u> Childers Affidavit at 1; <u>see</u> <u>also</u> P. Depo. at 25 ("They declined to hire [Childers]."). And, Larsen describes the environment as "highly political" and "toxic" when he worked in the dental laboratory in March 2012 through December 2014. Larsen Affidavit at 22. He states that Griffis told him in 2011 that he was "several months outside the 5-year to 10-year window required for new hires" which could delay his start date. <u>Id.</u> at 21. Neither Childers nor Larsen is serving a life sentence, and both inmates have upcoming 2022 release dates. <u>See</u> http://www.dc.state.fl.us/offenderSearch/detail (last visited August 9, 2022). As such, they are not similarly situated to Tedder, and their statements are not otherwise substantively relevant to Tedder's equal protections claims against Defendants.

Tedder acknowledged that the FDOC classification department controls inmate work assignments and any reassignments. P. Depo. at 28-29. He testified that the FDOC "procedure," id. at 29, is that "everything" an inmate does has "to go through classification," id. at 28.

As reflected in PRIDE's Inmate Transition Services Handbook (PRIDE handbook), inmates are hired to work in correctional programs to prepare them for jobs when they are released from FDOC custody. See Doc. 72-1 at 21 ("A fundamental purpose of PRIDE's industry programs is to prepare workers for employment upon their release from the institution."). For that reason as well as Tedder's immeasurable desire to learn a uniquely challenging skill, Tedder wanted a work assignment in the UCI dental laboratory, see P. Depo. at 35-39, as evidenced by his persistence in the application process. The PRIDE handbook states in pertinent part:

> Application procedures for a PRIDE industry assignment vary from institution to institution and according to the hiring needs of the industry. Inmates interested in a PRIDE assignment must first receive the approval of the institution's classification department, as the selection of inmate workers for PRIDE programs is done by the Department of Corrections. The PRIDE Industry Manager may have other requirements as a condition for hiring, and will make worker selections based upon these requirements from the selection offered by FDC.

Doc. 72-1 at 9.

Tedder asserts that he is a member of a protected class arising from his status as a close-custody, life-sentenced inmate. <u>See</u> SAC at 18-20; <u>see</u> <u>also</u> <u>generally</u> Response. However, protected classes typically hinge on immutable characteristics determined by the incident of birth (i.e., race, national origin, sex). <u>See</u> <u>Frontiero v. Richardson</u>, 411 U.S. 677, 686 (1973); <u>Williams v. Pryor</u>, 240 F.3d 944, 947 (11th Cir. 2001). Tedder has provided no evidence that the alleged disparate treatment was based on a protected class such as race, religion, national origin, or some other constitutionally protected basis. <u>See</u> <u>Jones</u>, 279 F.3d at 946-47. Instead, he proclaims that Defendants' apparent reason for not hiring him was the fact he was serving a sentence of life imprisonment. Because Tedder's status as a close-custody, life-sentenced inmate does not qualify him for membership in a protected class, his equal protection claim under the traditional theory of unlawful discrimination fails.

The Court turns next to Tedder's "class of one" equal protection claim. As a preliminary matter, the Court expresses significant reservation regarding the applicability of a "class of one" equal protection analysis to a failure to hire, employment claim, such as that raised here by Tedder. <u>In Engquist v. Or. Dep't of Agric.</u>, 553 U.S. 591 (2008), the Supreme Court determined that "a 'class-of-one' theory of equal protection has no place in the public employment context." <u>Id.</u> at 594. In doing so, the Court noted that "employment decisions are 'often

18

subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify,' and therefore are typically characterized by broad discretion." Brackin v. Anson, 585 F. App'x 991, 995 (11th Cir. 2014) (quoting Engquist, 553 U.S. at 604-05). For that and other reasons, the Court concluded that "the class-of-one theory of equal protection is a 'poor fit in the public employment context,' because it could create a constitutional claim out of nearly every employment decision." Id. (quoting Engquist, 553 U.S. at 605-07). Relying on Engquist, the Eleventh Circuit has stated that in the employment context, "[t]o treat like employees differently is not to violate the equal protection clause; rather, it is an accepted consequence of 'the broad discretion that typically characterizes the employer-employee relationship.'" Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269, 1274 (11th Cir. 2008) (quoting Engquist, 553 U.S. at 605). While the Court would not characterize an inmate seeking to work in a prison dental unit as a public employee, Tedder's attempt to transform his employment dispute with the FDOC into a section 1983 claim asserting a violation of the equal protection clause by a state actor should fail for the same reasons expressed in Engquist. See Lima v. Fla. Dep't of Child. & Fam., Case No. 8:13-cv-1809-T-35TBM, 2014 WL 12617754, at *2 (M.D. Fla. Nov. 29, 2014) (acknowledging that "a 'class of one' claim also

does not operate as a conduit for bringing an equal protection claim based on workplace unfairness").

Regardless, even if an equal protection claim were viable in this context, Tedder has not shown that there remains a genuine issue for trial on his "class of one" claim because he fails to identify a sufficiently similarly situated comparator. PBT Real Estate, LLC v. Town of Palm Beach, 988 F.3d 1274, 1285 (11th Cir. 2021) (noting that "[in] this Circuit, we apply the 'similarly situated' requirement 'with rigor') (quoting Griffin Indus., 496 F.3d at 1207). Tedder provides the names of life-sentenced inmates who were assigned to work in the dental laboratory, and queries why Defendants chose to hire them instead of him. He generally asserts that Defendants hired: (1) William Davis #888492, who transferred from the furniture factory to the dental laboratory on June 13, 2018, which was "111 days" after Griffis told Tedder she could not hire him because of his life sentence, SAC at 20 (parenthetical omitted); see Response at 3; (2) Steven Weldon #573245, who was hired as a result of nepotism in July 2019, over one year after Griffis told Tedder she could not hire him, see SAC at 20; Response at 3; and (3) Arthur Wilson #863153, who was hired in March/April 2020, see SAC at 20; Response at 3. He also complains that Defendants "made no attempt to contact [him] for hiring when [they] were hiring life term inmates." Response at 3 (emphasis and quotation

omitted). Tedder also provides a list of inmates as support for his contention that Defendants wrongly used the six-to-ten-year hiring policy (that an inmate should have six to ten years remaining on his sentence when selected for the work program) to justify their actions. See id. at 5-6.

While Tedder repeatedly proclaims that other life-sentenced inmates were selected for work assignments when Defendants should have chosen him, see P. Depo. at 48, it is undisputed that the selection of inmates for work assignments was based on a variety of factors including industry production needs, the promotion of inmate workplace training, and preparation of inmates who may qualify for the transition program. See generally Doc. 72-1; see also generally P. Depo. Indeed, the record reflects that inmates generally were chosen based on industry operational needs, which included the selection of a percentage of long-term inmates (with end-of-sentence (EOS) dates greater than ten years) to ensure "operational continuity" and to "assist in skill transfer to other inmate workers" as well as the selection of a percentage of lesser-term inmates who could qualify for the transition program. Docs. 38-2 at 1; 72-1 at 107.

Regardless of the role Tedder's life-sentence may have played in his inability to obtain a position in the dental laboratory, it provides no basis for relief for his "class of one" equal protection claim under the Fourteenth

21

Amendment. Tedder has produced no evidence showing that Defendants intentionally treated him differently from other truly similarly situated individuals, nor has he presented evidence suggesting that there was no rational basis for the different treatment. See Griffin Indus., 496 F.3d at 1202-07; Bumpus, 448 F. App'x at 5.

As to the similarly situated element, Tedder has not shown that Davis, Weldon, and Wilson were similarly situated inmates. He merely describes them as life-sentenced inmates who were selected after he was denied a position and was still available for a work assignment. Notably, Davis, Weldon, and Wilson were hired at different times (well after Defendants had assessed Tedder's qualifications and rejected him for a position) as well as under potentially dissimilar circumstances. See E & T Realty v. Strickland, 830 F.2d 1107, 1109 (11th Cir. 1987) ("Different treatment of dissimilarly situated persons does not violate the equal protection clause."). While Tedder testified to his belief that "[t]hey ain't no better than me," P. Depo. at 48, and that he "guarantee[s]" the Court that none of the three other life-sentenced inmates have a 2024 PPRD, Response at 14, he makes no mention of any other characteristics of these inmates. He does not describe their backgrounds, skills, education, disciplinary report (DR) records, custody statuses, and/or "problems" (or lack thereof) with staff and/or inmates – all factors that PRIDE

considered during the application/selection process. <u>See</u> P. Depo. at 17. Nor does he provide any other information comparing these inmates to his own circumstances and qualifications for the position.

The Eleventh Circuit has emphasized the importance of applying "the 'similarly situated' requirement [of a "class of one" claim] 'with rigor.'" <u>PBT Real Estate</u>, 988 F.3d at 1285 (quoting <u>Griffin Indus.</u>, 496 F.3d at 1207); <u>see also</u> <u>Douglas</u>, 541 F.3d at 1275. Additionally, a court evaluates the similarly situated requirement "in light of the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision." <u>Burns</u>, 999 F.3d at 1352 (quoting <u>Griffin Indus.</u>, 496 F.3d at 1203) (internal quotations omitted). To raise a genuine issue for trial, Tedder has the burden of identifying a comparator who is similarly situated <u>in all respects relevant to the selection of dental unit workers</u>. This he has not done. Although Tedder describes his alleged comparators generally as life sentenced inmates, he fails to provide any information regarding the other factors Defendants reasonably would have considered in selecting an inmate for work in the dental unit. <u>Leib</u>, 558 F.3d at 1307 (noting that the similarly situated requirement is rigorously applied and finding dismissal of a "class of one" claim proper due to the lack of factual detail regarding the similarly situated comparators"; <u>Griffin Indus.</u>, 496 F.3d at 1205 (noting that "[a] 'class

23

of one' plaintiff might fail to state a claim by omitting key factual details in alleging that [he] is 'similarly situated' to another"). Because Tedder has failed to make a sufficient showing on an essential element of his claim for which he bears the burden of proof, entry of summary judgment in favor of Defendants is proper. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co., 483 F.3d 1265, 1268 (11th Cir. 2007) ("The plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") (citations and internal quotations omitted).

Tedder also fails to raise a genuine issue for trial as to the rational basis element of his claim. The record reflects that, as of February 17, 2017, PRIDE, in conjunction with the FDOC, considered a variety of factors when determining which inmates would be selected for work assignments. See Doc. 72-1 at 106-07. One such factor was whether the inmate would be well-suited for the transition program, an end result that interested Tedder. See SAC at 27. Green notified Tedder that they were selecting inmates with six to ten years remaining on their sentences since they would be candidates for the transition program. See Doc. 38-2 at 1. According to Tedder, he expected to

24

meet with the parole commission again before his release from FDOC custody,

but the commission could change his 2024 PPRD. P. Depo. at 13-14. Tedder

testified about his 1976 life sentence at his deposition. He stated in pertinent

part:

> When I came in the system, I have a life
> sentence with a mandatory 25-year term. Of course,
> the 25-year term has been completed many years ago.
> So I have now the life sentence. And having the life
> sentence, I'm parole eligible, because the law at that
> time, after 25 years, you became parole eligible. 18
> months prior to me completing the 25-year mandatory,
> the parole commission came and interviewed me. After
> the interview and they scored me out on a matrix table
> range, I scored at the five points. And it was a
> customary total time between 240 and the 300 months,
> which I was supposed to have served before being, I
> guess put out on parole. Of course, that never came to
> fruit[ion] . . . But when they established the date
> through all these things, they gave me a 2021 date.
> Well, I was at Gulf Correctional Institution. Because I
> wouldn't snitch on my roommate, they gave me two
> bogus DRs. When I went before the parole commission,
> they backed up my date by three years because of the
> two DRs. And that was 2024.

Id. at 12. He testified that he met with the parole commission in 1997, 2002,

2007, 2012, and 2019, and expects to meet with the commission again for an

"extraordinary review" before he is released from FDOC custody. Id. at 13; see

Fla. Admin. Code r. 23-21.0155, Extraordinary Review Procedures. Tedder

described the commission as having "so much discretion," and affirmed that it

could decide to extend his 2024 PPRD since it is not a firm release date. P.

Depo. at 13-14. According to Tedder, during the five-minute meeting, Griffis told Tedder that the dental laboratory had reached its limited hiring capacity of life-sentenced inmates, and advised Tedder to contact them if his "sentence structure" changed. Id. at 31-32.

To establish an equal protection claim based on a "class of one" theory, Tedder must be able to show that there is no rational basis for the difference in treatment about which he complains. Griffin Indus., 496 F.3d at 1207-08. Here, he cannot do so. Tedder's allegations made in the SAC, his deposition testimony, the fact that the possibility that his PPRD could change was discussed during the interview, and the desire to select inmates who would be candidates for the transition program establish that his life sentence and potentially fluctuating release date may have been considered at the time Tedder was rejected for a position.[7] Such a consideration would be rational such that Tedder cannot establish that there was "no rational basis for the difference in treatment." Id. at 1207 ("The complaint is filled with facts that suggest a rational basis for the defendant's actions. We need not ignore these facts in favor of [plaintiff]'s bald assertion that the defendants acted without any rational basis.").

---

[7] At his deposition, Tedder acknowledged that he did not have any evidence as to other inmates with life-sentence structures similar to his who received dental laboratory jobs. P. Depo. at 44.

26

On this record, Tedder fails to produce any evidence suggesting that Defendants intentionally treated him differently from other <u>similarly situated</u> individuals. Nor has he produced any evidence that there was no rational basis for the allegedly different treatment. As such, Defendants' Motion is due to be granted as to Tedder's Fourteenth Amendment equal protection claims against Defendants PRIDE, Griffis, and Green.[8]

## B. Tedder's Request in his Response

In his Response, Tedder requests that the Court "revisit" its March 1, 2021 ruling as to his request for punitive damages, <u>see</u> Order (Doc. 55), because the United States Court of Appeals for the Eleventh Circuit, on April 9, 2021, decided <u>Hoever v. Marks</u>, 993 F.3d 1353 (11th Cir. 2021) (stating that the Prison Litigation Reform Act permits punitive damages absent a showing of physical injury). <u>See</u> Response at 7-8. Preliminarily, the Court notes that a request for affirmative relief is not properly made when simply included in a response to a motion. <u>See</u> Fed. R. Civ. P. 7(b); <u>see</u> <u>also</u> <u>Rosenberg v. Gould</u>, 554 F.3d 962, 965 (11th Cir. 2009) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue

---

[8] In light of this conclusion, the Court need not address Defendants PRIDE, Griffis, and Green's argument on the issue of qualified immunity.

has not been raised properly.") (quoting <u>Posner v. Essex Ins. Co.</u>, 178 F.3d 1209, 1222 (11th Cir. 1999)).

Moreover, even if it were proper to include such a request in the Response, the request is otherwise due to be denied for failure to comply with Local Rules 3.01(a) and 3.01(g), United States District Court, Middle District of Florida (Local Rule(s)). Local Rule 3.01(a) requires a memorandum of legal authority in support of a request from the Court. <u>See</u> Local Rule 3.01(a). Local Rule 3.01(g) requires certification that the moving party has conferred with opposing counsel in a good faith effort to resolve the issue raised by the motion and advising the Court whether opposing counsel agrees to the relief requested. <u>See</u> Local Rule 3.01(g). Thus, the Court will not entertain Tedder's request for relief included in the Response.[9]

### C. Tedder's Claim Against the FDOC Secretary[10]

In the SAC, Tedder asserts that Defendant Inch, through the FDOC classifications officers at UCI, is responsible for Tedder's ability to participate

---

[9] Regardless, given the Court's conclusion that Defendants PRIDE, Griffis, and Green are entitled to summary judgment in their favor as to Tedder's Fourteenth Amendment equal protections claims, Tedder's request to revisit the Court's ruling is moot.

[10] Tedder sues Mark Inch in his official capacity as FDOC Secretary, a position he no longer holds. Ricky D. Dixon, who was appointed in November 2021, is the current FDOC Secretary. Therefore, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Ricky D. Dixon is substituted as the proper party Defendant as the FDOC Secretary with respect to the official-capacity claim.

in the prison work programs. See SAC at 23-24, 26-27. He requests an order directing that the UCI classification department and PRIDE comply with the Florida Statutes and any court orders in future hiring and a declaration that they will enforce the law. See id. at 26-27. Additionally, he suggests that PRIDE confer with the parole commission to incorporate inmates like him (parole-eligible, life-sentenced with less than ten years remaining before reaching his PPRD) into PRIDE's new inmate profile because they also may be candidates for PRIDE's transition program. See id. at 27.

In his Response, Tedder asserts that his official-capacity claim for prospective declaratory and injunctive relief against Defendant FDOC Secretary (now Ricky D. Dixon) still remains viable. See Response at 9 (citing Order, Doc. 55, at 21-23). In light of the Court's conclusion that Defendants PRIDE, Griffis, and Green are entitled to summary judgment in their favor as to Tedder's Fourteenth Amendment equal protections claims, Tedder's official-capacity claim for prospective declaratory and injunctive relief against FDOC Secretary Dixon is due to be dismissed without prejudice. Notably, Tedder may apply again for a PRIDE work assignment, and if he is not selected, he may seek relief through the prison grievance procedure.

In consideration of the foregoing, it is now

**ORDERED**:

1.     Defendants PRIDE, Griffis, and Green's Motion for Summary Judgment (Doc. 66) is **GRANTED**.

2.     Tedder's official-capacity claim for prospective declaratory and injunctive relief against Defendant FDOC Secretary Ricky D. Dixon is **DISMISSED without prejudice**, and Defendant Dixon is **DISMISSED** as a Defendant in this action**.**

3.     The Clerk shall enter judgment in favor of Defendants PRIDE, Green, and Griffis, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 23rd day of August, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-1 8/22
c:
Mack R. Tedder, FDOC # 035639
Counsel of Record